FILED

2026 JAN 30 PM 1: 07

US DISTRICT COURT
EASTERN DIST. TENN.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

LEE RAKUN,

Plaintiff,

v.

No. 3:26-cv-43
Crytzer/poplin

SEVIER COUNTY, TENNESSEE, DEPUTY CHAD OGLE,
DETECTIVE DEXTER ROBBINS, DETECTIVE JIMMY HUDDLESTON,
DEPUTY TIM CULOTTA, DEPUTY HUNTER CATES,
TBI AGENT IAN ALLEN, TBI AGENT KRIS SANDERS,
DEPUTY ATTORNEY GENERAL JAMES DUNN,
DEPUTY ATTORNEY GENERAL CHARLES MURPHY,

Defendants.

## PLAINTIFF'S ORIGINAL COMPLAINT

This Complaint is brought pursuant to 42 U.S.C. 1983, the Fourth, Sixth, and Fourteenth

Amendments to the United States Constitution, and *Monell v. New York City Dept. of Social*

*Services,* 436 U.S. 658 (1978). The Complaint has claims based upon constitutional violations

during the course of a criminal contact, seizure, arrest, search, and prosecution.

### I.                           PARTIES

### (1)                         LEE RAKUN

Lee Rakun is the Plaintiff, and a corporeal human being. For the sake of brevity, the

Plaintiff will be referred to as RAKUN. RAKUN has been a resident of Tennessee and Sevier

County, Tennessee since 2021. RAKUN lives in the City of Sevierville, Tennessee.

### (2)                    SEVIER COUNTY, TENNESSEE

Sevier County, Tennessee is a political subdivision of the State of Tennessee. For the sake of

brevity, Defendant will be referred to as SEVIER. SEVIER is in Eastern Tennessee and its

1

County seat lies in Sevierville. SEVIER has the Sevier County Sheriff's Office as its law

enforcement arm. SEVIER employed Defendants Ogle, Huddleston, Robbins, Cates, and Culotta

on July 13, 2021.

(3)                                **CHAD OGLE**

Chad Ogle was a Sevier County Sheriff's Deputy on July 13, 2021. For the sake of

brevity, Defendant will be referred to as OGLE. OGLE acted under the color of Tennessee

law as a licensed Peace Officer on July 13, 2021 while on duty. OGLE is being sued in his

individual capacity only.

(4)                              **DEXTER ROBBINS**

Dexter Robbins is a Sevier County Sheriff's Detective, and was one on July 13, 2021. For

the sake of brevity, Defendant will be referred to as ROBBINS. ROBBINS acted under the color

of Tennessee law as a licensed Peace Officer on July 13, 2021 while on duty. ROBBINS is being

sued in his individual capacity only.

(5)                             **JIMMY HUDDLESTON**

Jimmy Huddleston is a Sevier County Sheriff's Detective, and was one on July 13, 2021.

For the sake of brevity, Defendant will be referred to as HUDDLESTON. HUDDLESTON acted

under the color of Tennessee law as a licensed Peace Officer on July 13, 2021 while on duty.

HUDDLESTON is being sued in his individual capacity only.

(6)                                **TIM CULOTTA**

Tim Culotta was a Sevier County Sheriff's Deputy on July 13, 2021. For the sake of brevity,

Defendant will be referred to as CULOTTA. CULOTTA acted under the color of Tennessee law

as a licensed Peace Officer on July 13, 2021 while on duty. CULOTTA is being sued in his

individual capacity only.

2

**(7)**                          **HUNTER CATES**

Hunter Cates was a Sevier County Sheriff's Deputy on July 13, 2021. For the sake of brevity, Defendant will be referred to as CATES. CATES acted under the color of Tennessee law as a licensed Peace Officer on June 27, 2021 while on duty. CATES is being sued in his individual capacity only.

**(8)**                          **IAN ALLEN**

Ian Allen is a Special Agent for the Tennessee Bureau of Investigation, and was one on July 13, 2021. For the sake of brevity, Defendant will be referred to as ALLEN. ALLEN acted under the color of Tennessee law as a licensed Peace Officer on June 27, 2021 while on duty. ALLEN is being sued in his individual capacity only.

**(9)**                          **KRIS SANDERS**

Kris Sanders is a Special Agent for the Tennessee Bureau of Investigation, and was one on July 13, 2021. For the sake of brevity, Defendant will be referred to as SANDERS. SANDERS acted under the color of Tennessee law as a licensed Peace Officer on June 27, 2021 while on duty. SANDERS is being sued in his individual capacity only.

**(10)**                        **JAMES DUNN**

James Dunn is a Prosecutor for the Tennessee Attorney General's Office, and was one on July 13, 2021 and thereafter. For the sake of brevity, Defendant will be referred to as DUNN. DUNN acted under the color of Tennessee law as a licensed Tennessee Prosecutor. DUNN is being sued in his individual capacity only.

**(11)**                       **CHARLES MURPHY**

Charles Murphy is a Prosecutor for the Tennessee Attorney General's Office, and was one on July 13, 2021 and thereafter. For the sake of brevity, Defendant will be referred to as MURPHY. MURPHY acted under the color of Tennessee law as a licensed Tennessee Prosecutor. MURPHY is being sued in his individual capacity only.

3

## II.                SERVICE OF PROCESS

**(1)**            **SEVIER COUNTY, TENNESSEE**

Sevier County, Tennessee is a political subdivision of the State of Tennessee. SEVIER may be served process through its Chief Executive Officer, Larry Waters, at 125 Court Avenue, Suite 201E, Sevierville, Tennessee 37862.

**(2)**            **CHAD OGLE**

Chad Ogle was a Sevier County Sheriff's Deputy on July 13, 2021. OGLE may be served process at his new place of employment, C. Ogle Automotive, LLC, 11941 Chapman Hwy, Seymour, Tennessee 37865.

**(3)**            **DEXTER ROBBINS**

Dexter Robbins is a Sevier County Sheriff's Detective, and was one on July 13, 2021. ROBBINS may be served process at his place of employment, the Sevier County Sheriff's Office at 106 West Bruce Street, Sevierville, Tennessee 37862.

**(4)**            **JIMMY HUDDLESTON**

Jimmy Huddleston is a Sevier County Sheriff's Detective, and was one on July 13, 2021. HUDDLESTON may be served process at his place of employment, the Sevier County Sheriff's Office at 106 West Bruce Street, Sevierville, Tennessee 37862.

**(5)**            **TIM CULOTTA**

Tim Culotta was a Sevier County Sheriff's Deputy on July 13, 2021. CULOTTA may now be served process at his new place of employment, the Sevierville Police Department, 300 Gary R. Wade Road, Sevierville, Tennessee 37862.

**(6)**            **HUNTER CATES**

Hunter Cates was a Sevier County Sheriff's Deputy on July 13, 2021. CATES may now be served process at his new place of employment, Y-12, 301 Bear Creek Road Y-12, Oak Ridge, Tennessee 37830.

4

**(7)**                                    **IAN ALLEN**

Ian Allen is a Special Agent for the Tennessee Bureau of Investigation, and was one on

July 13, 2021. ALLEN may be served process at his place of employment, the Tennessee Bureau

of Investigation at 1791 Neals Commerce Lane, Knoxville, Tennessee 37914.

**(8)**                                    **KRIS SANDERS**

Kris Sanders is a Special Agent for the Tennessee Bureau of Investigation, and was one on

July 13, 2021. SANDERS may be served process at his place of employment, the Tennessee

Bureau of Investigation at 1791 Neals Commerce Lane, Knoxville, Tennessee 37914.

**(9)**                                    **JAMES DUNN**

James Dunn is a Prosecutor for the Tennessee Attorney General's Office, and was one on

July 13, 2021 and thereafter. DUNN may be served process at his place of employment,

Tennessee Attorney General's Office at 125 Court Avenue, Suite 301-E, Sevierville, Tennessee

37862.

**(10)**                                   **CHARLES MURPHY**

Charles Murphy is a Prosecutor for the Tennessee Attorney General's Office, and was one

on July 13, 2021 and thereafter. MURPHY may be served process at his place of employment,

Tennessee Attorney General's Office at 125 Court Avenue, Suite 301-E, Sevierville, Tennessee

37862.

**III.**                    **SYNOPSIS OF HISTORICAL EVENTS**

**(1)**    On July 13, 2021, RAKUN had an outing with his adult child, Barret Rakun. Barret and

adult sister Alexis Rakun were visiting RAKUN from Texas. RAKUN and Barret had been at a

community pool for most of the afternoon. RAKUN had relaxed and enjoyed alcoholic

refreshments that afternoon. When the duo returned to RAKUN's home in Sevierville, Barret

proceeded to 'decorate' the room he was quartered in with mementos…including sporting

knives. Barret secured these items to the walls of his room.

5

**(2)** Later that afternoon, RAKUN and Barret engaged in playful roughhousing. Both contacted the walls with their bodies and backs. Objects were knocked off the walls. Apparently, Barret Rakun abraded such objects with his back. Upon contact with his sister Alexis, Barret fabricated the tale that "he was stabbed with a Rambo knife by RAKUN." In the first instance, any objects that contacted Barret were hung on the wall by him. Additionally, any displaced objects from the wall were the result of Barret contacting them with his body. Barret had a superficial injury which required 1 stitch to close. The siblings left the home and went down the street. Further, any displayed knives belonged to Barret himself.

**(3)** Alexis and Barret ended up at a neighbor's house. The siblings recounted their tale to the neighbor, who called 911 dispatch. Bear in mind, it took almost an hour for law enforcement to arrive after the alleged incident.

**(4)** Deputy Chad Ogle was the first responder at RAKUN's home. OGLE turned off his siren approaching RAKUN's home. OGLE didn't identify himself as law enforcement to RAKUN. OGLE placed himself at approximately a 180 degree angle, so as not to be seen by RAKUN. OGLE demanded the occupant 'step out.' OGLE had his service pistol drawn and at the ready. When RAKUN opened the door, he didn't know who had arrived. RAKUN lived in the country; it wasn't uncommon for residents to own and possess firearms on their premises. RAKUN answered the door with a bolt-action hunting rifle in a 'Port Arms' position. This meant the rifle was across RAKUN's chest in a diagonal manner—like a toy soldier. RAKUN was startled by the stomping on his front deck, and the pounding on his front door. RAKUN's home is situated on cinder blocks above ground. OGLE's "pounding" actually caused a violent vibration and resonation in the home's structure. RAKUN was alarmed and fearful of who/what had arrived. The raucous din of pounding and shouting indicated some presence might mean ill-will.

6

**(5)** RAKUN had and has chronic Glaucoma. This affliction greatly affects RAKUN's ability to see, discern, and interpret physical objects, both near and far. As RAKUN craned to spot the door knocker, he was shot 3 times by Deputy Chad Ogle. RAKUN tumbled out of his house and onto his porch. RAKUN was gravely stricken in his L3 vertebrae, suffering a fracture and internal injuries. RAKUN soon went into acute respiratory failure and hemorrhagic shock, as he was transported by helicopter to the hospital.

**(6)** Bogus criminal charges were filed to protect the careers and lives of the first responders. Law enforcement engaged in malfeasance and manufactured evidence, resulting in a host of felony charges. These charges exist in *The State of Tennessee v. Lee Rudolph Rakun,* CR28846 in the Fourth Judicial District. The malfeasance is readily shown in belatedly produced body camera videos.

**IV.**      **SUBJECT MATTER JURISDICTION AND VENUE**

This Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. 1331—federal question. This Court is the proper venue under 28 U.S.C. 1391, as all of the relevant events occurred within this district. Knoxville is the closest federal court to Sevier County.

**V.**      **"THE DISCOVERY RULE" APPLIES TO THESE CLAIMS**

**(1)** Due to: (1) dire medical trauma causing a loss of memory; (2) law enforcement and Prosecutorial malfeasance; and (3) happenstance intoxication it became impossible and implausible for RAKUN to know the true nature of the events on July 13, 2021 and thereafter. The "Discovery Rule" is a Court created doctrine which provides an equitable tolling of the statute of limitations because events, circumstances, or party opponents kept a Plaintiff from learning the facts and origins of their injuries, *Snyder-Hill v. Ohio State University,* 48 F.4th 686 (6th Cir. 2022).

**(2)** OGLE utilized deadly force against RAKUN, firing his service pistol 5 times—and striking

7

RAKUN 3 times. The bullets grazed Rakun's right arm, penetrated Rakun's left arm, and a bullet partially severed RAKUN's L3 vertebrae. This last missile caused life-threatening trauma. RAKUN experienced hemorrhagic shock, respiratory failure, damage to his kidney, damage to his spleen, a broken rib, a pierced bowel, and other trauma. RAKUN needed two emergency surgeries within the first 3 days. RAKUN required additional surgery later in 2021. The medical trauma described above was accompanied by the effects of anesthesia. RAKUN's mind and body went into shock, and he nearly died. As a result, RAKUN could not remember the facts of the events on July 13, 2021 due to the near-death experience, the medical trauma, the biological shock, the prodigious loss of blood, the respiratory failure, and the effects of the surgical anesthesia. In fact, much of the medical trauma still manifests itself on a daily basis. Law enforcement attempted to interview RAKUN immediately after his intensive surgeries, on or about July 17, 2021. RAKUN informed them he had no recollection of the events due to his medical circumstances. Over the course of time, this memory did not improve.

(3) All RAKUN had were the accounts and fabrications of others. These law enforcement theories were shown to be false with the delivery of criminal discovery videos in CR28846. On or about February 5, 2025, RAKUN received the body camera video from OGLE. This video clearly showed the allegations of assault and attempted murder of a Peace Officer were false. RAKUN never discharged his weapon or attempted to harm OGLE, who didn't announce his presence as law enforcement. RAKUN also received other videos showing the allegations against his children were false. RAKUN had diligently requested, demanded, and pursued law enforcement files during Cause CR28846 through a comprehensive *Brady* Motion, filed *Pro Se* on September 15, 2023. RAKUN's previous Attorney, Scott Lanzon, had filed a Rule 16 Motion requesting electronic files and videos in early 2022. None were provided.

In fact, RAKUN still has a pending *Brady* Motion, and *Brady* Motion to Dismiss for willful

8

denials of law enforcement files in CR28846. Thus, it took 3 ½ years for RAKUN to receive mundane Sheriff's files from July 13, 2021. Since February 5, 2025, RAKUN has received additional information which confirms law enforcement malfeasance. RAKUN had also been told by the Tennessee Attorney General's Office that certain "information didn't exist." Information that 'didn't exist' was subsequently found to exist, and belatedly given to RAKUN in 2025. Thus, RAKUN was more than diligent in seeking evidence regarding his circumstances on July 13, 2021—and was thwarted by government actors.

RAKUN even hired a Private Investigator to try and obtain government records. He was thwarted and obstructed by Sevier County and the Tennessee Bureau of Investigation. These entities figured out who the true recipient of the information would be—and they balked. As a result, RAKUN's money went down the drain. The Private Investigator did not receive government documents because of willful chicanery by government officials.

**(4)** On July 13, 2021, RAKUN had been consuming Bacardi Rum at the community pool. This likely had some effect on his recollection of the day's events. Why wouldn't RAKUN take advantage of amenities? RAKUN had retired and moved to Tennessee to enjoy its scenic beauty.

**(5)** In sum, RAKUN could not have known the true nature of events on July 13, 2021 due to neurological trauma, hemorrhagic shock, respiratory failure, organ failure, anesthesia, alcohol, and government obstruction of law enforcement files. It was only beginning on February 5, 2025 that RAKUN could visibly observe law enforcement malfeasance, deceptive fabrications by his adult children, and factually fabricated scenarios and evidence. From the pendency of criminal charges RAKUN had vigorously pursued the State's "evidence," both *Pro Se* and through counsel. RAKUN's *Brady v. Maryland,* 373 U.S. 83 (1963) Motion(s) are **still pending.**

**VI.**               **FACTUAL ALLEGATIONS AND ORIGINS**

**(1)**   Plaintiff RAKUN served as a San Antonio Police Department Officer, Patrolman,

9

Technician, Sergeant, and Lieutenant during his 27 year career. RAKUN received an Honorable Separation in 2020, and retired with full pension. RAKUN moved to Sevierville, Tennessee in the Spring of 2021. RAKUN purchased a home in Sevierville in a rural setting. RAKUN had 3 adult children at this time. Brittany Rakun, was the oldest child. She was born in 1990. Alexis Rakun was the middle child. She was born in 1994. Barret Rakun was the youngest child. He was born in 2002. Barret had just graduated from high school in the Spring of 2021. Barret and Alexis went to visit RAKUN and observe his new home in July 2021. RAKUN had no prior criminal record before July 13, 2021.

**(2)**  RAKUN's children had grown up with his ex-wife Evelyn since 2006. But, RAKUN had always supported his children financially, and with love. Barret was 18 years old in 2021, and was at an odd juncture in his life. He was an adult, but had no plan for his future. Regardless, RAKUN welcomed his children for the visit.

**(3)**  Barret and Alexis had been staying at RAKUN's house a few days before the July 13, 2021 events. The plan was for Barret to enjoy his Summer and the children would visit with their Dad for a few weeks. Barret and Alexis slept in their own rooms, and did not bring very many possessions with them. On July 13, 2021, RAKUN and Barret went to a Community Pool. They relaxed at the center. RAKUN occasionally had drinks spiked with Rum. The pair left the Center at about 4:30 PM. RAKUN and Barret returned home shortly thereafter. All seemed well. Barret went upstairs to hang keepsakes and mementos on the wall. Alexis was on the porch using the Internet.

**(4)**  At some point, RAKUN passed by Barret's room. The two had an exchange, and this spawned male roughhousing and grappling. Both men bumped into the wall during the tussle, and objects were displaced from the wall. During the scrum, Barret's back brushed up against, and knocked over objects. One of these items was his own hunting knife. Barret's back made

10

contact with his own knife and other objects hung on the walls of the bedroom. The two wrestled

upright, and on the ground. But, no injuries resulted from this. RAKUN departed, and Barret

went downstairs to seek out Alexis.

(5) Alexis noticed a trickle of blood down Barret's back. Barret told Alexis that RAKUN had

"stabbed him with a Rambo knife." This was patently false. The knife Barret abraded was not

any such type. Barret's back made contact with a pointed or sharp objects. Beyond this, Barret's

back had a superficial wound. It took 1 stitch to close the wound at the hospital. It was not a deep

stabbing or puncture wound. In fact, Barret brushed up against his own knife during the tussle.

RAKUN's two children were now in 'fantasyland.' They believed RAKUN wanted to harm

them. Barret and Alexis decided to leave the house and give their father 30 minutes to "cool off."

(6) Barret and Alexis ventured off the property several hundred yards. At this point, Alexis went

back to retrieve the keys to RAKUN's truck. Alexis encountered RAKUN inside the house.

RAKUN has started to feel some effects of the Rum by this point. But, RAKUN was not violent

nor threatening. Alexis formed the notion RAKUN wanted to harm his children. Alexis ran out of

the house and joined Barret in a field. At this point, Alexis "thought" she heard gunshots. But,

she didn't know their origin, or their target…if any. It was not uncommon in rural Sevier County

for homeowners and residents to discharge firearms. Particularly, as it wasn't far removed from

July 4, 2021. However, RAKUN's immediate neighbor had been watching events unfold. This

neighbor claims he didn't hear any gunshots from RAKUN, and never saw RAKUN shoot a

weapon on July 13, 2021.

(7) Alexis and Barret indulged the fantasy any loud popping sounds must be gunfire directed at

them. They ran down the street and hid amongst some trees. They were discovered by the

homeowners, and relayed their fiction RAKUN had stabbed Barret. Connie Brown called 911

dispatch. Brown stated Barret had been stabbed, there was no ongoing crisis, and there was no

11

gunfire. Brown also told the dispatcher Alexis and Barret had left the house. Brown didn't

provide any description of RAKUN, nor know anything about his appearance, race, build, or

height. Neither Barret nor Alexis ever gave an account to, or made a 911 phone call on July 13,

2021. Thus, all 911 calls came from neighbor Connie Brown. Brown had no personal knowledge

of these matters, relied on hearsay, and gave 911 dispatchers her own interpretation of events. In

any event, Connie Brown stressed there was no ongoing violence, danger, or dispute.

(8) Deputy Chad Ogle was one of the first Deputies dispatched. Bear in mind, the events

involving RAKUN and Barret jostling had occurred over 30 minutes before Connie Brown

called the 911 dispatchers. Further, it took Deputy Ogle over 20 minutes to reach Rakun's

residence after he was dispatched.

(9) Thus, it was almost an hour from the time RAKUN and Barret bounced each other off the

walls inside the house before OGLE arrived at RAKUN's home. OGLE had little or no

information from the dispatch. Also, OGLE had no personal knowledge of these events.

However, OGLE was told Alexis and Barret had left the property and were not in danger. OGLE

was informed that RAKUN was unarmed. OGLE also knew it had been many minutes since

the family tiff had occurred. OGLE did receive hearsay accounts from Connie Brown and the

911 dispatcher. OGLE made a conscious choice not to drive where Alexis and Barret were

(Connie Brown's house). OGLE made a conscious choice not to talk directly to Alexis and

Barret. Ogle made a conscious choice not to gather facts and confirm information. Instead, he

chose to drive directly to RAKUN's home. It was not much more than a quarter mile between

Brown's and RAKUN's homes. At no point did OGLE seek to learn or gather information—

before or after RAKUN was shot. There is no way that OGLE could be reasonably assured the

person he shot was RAKUN. Connie Brown did not provide any information in the way of

physical description. She couldn't; she didn't know RAKUN. None of the first responders ever

12

asked RAKUN to identify himself, or provide identification.

(10) OGLE made the conscious choice to turn off his sirens as he approached RAKUN's household. OGLE made the conscious choice not to announce himself as "law enforcement" to RAKUN. OGLE made the conscious choice to utilize deadly force against RAKUN by drawing his service pistol and having it at the ready. As OGLE exited his cruiser, he "stomped" on RAKUN's wooden front porch deck. As OGLE faced RAKUN's front door, OGLE "pounded" on it. This raucous cacophony actually shook the elevated foundations of RAKUN's home. The home is situated above ground, on cinder blocks. This shuddering alarmed RAKUN, as it indicated some unknown and belligerent person had arrived. Although fearful, RAKUN made an effort to determine the source of this disturbance. OGLE made the conscious choice to position himself at a 180 degree angle, so RAKUN couldn't see him. RAKUN has degenerative Glaucoma, and had it on July 13, 2021. RAKUN's visual acuity is greatly diminished, and it's difficult for RAKUN to see and discern objects at any distance. Especially, if a person places themselves at extreme angles in RAKUN's peripheral vision (180 degrees). OGLE made the conscious choice to command RAKUN to "step out." RAKUN was inside his home, behind a closed door. OGLE commanded him to step outside. OGLE gave no commands or opportunity for RAKUN to drop his deer rifle positioned diagonally across his chest. When OGLE arrived, there were no disturbances, crimes, or signs of distress at RAKUN's home.

(11) OGLE created a deadly force scenario, and he discharged his service pistol 5 times at RAKUN. Two bullets entered RAKUN's living room. One bullet glanced off the front logs and appears to have thrown splinters, and hit RAKUN's right arm. Another bullet entered RAKUN's left arm, and penetrated deeply. It could not be removed through surgery. The last bullet impacted RAKUN as he was already lying horizontal on his back. This critical shot was delivered with RAKUN sprawled on his back, facing his doorway. Thus, RAKUN was unarmed,

13

and not even facing OGLE when the critical shot to his L3 vertebrae was delivered. After the first bullet struck RAKUN, the momentum knocked him out of his home's interior. RAKUN pirouetted, turned around, and landed on his back…flat on his front porch. It was then that OGLE discharged the critical round which devastated RAKUN's internal organs and L3 vertebrae. This shot was delivered when RAKUN was unarmed, not even facing OGLE, and when OGLE was actually behind RAKUN. This last bullet nearly severed RAKUN's spine, traumatized RAKUN's kidney, perforated a bowel, led to hemorrhagic shock, and caused respiratory failure. Within a few minutes, RAKUN was in a comatose state and dying on his front porch.

**(12)** At the same time OGLE was attacking RAKUN, CATES and CULOTTA had trespassed over RAKUN's fence, and towards the rear of the home. After RAKUN was shot, CATES and CULOTTA ran to the front. OGLE, CATES, and CULOTTA roughly contorted RAKUN's limbs, turned him over, and jumped on his back. The 3 Deputies rested their weight and knees on RAKUN's already injured spine. They rolled RAKUN over, and left him handcuffed behind his back, and horizontally lying on the front porch. CULOTTA also extracted sundry bullets from RAKUN's pockets and tossed them on RAKUN's front porch. This will have great significance when TBI arrives and collects "evidence."

**(13)** CATES and CULOTTA know Alexis and Barret are safely down the street. The 3 Deputies have good reason to believe RAKUN is the sole occupant. Nevertheless, CATES and CULOTTA conduct an improvised and illegal intrusion and search of RAKUN's residence. They dash inside RAKUN's house for 72 seconds. It's quite curious and relevant CATES and CULLOTTA didn't observe any dead dog on the premises.

**(14)** Meanwhile, RAKUN asks OGLE if he is "under arrest." OGLE replies RAKUN **is being detained.** Thus, OGLE just stated, he used deadly force on a citizen, and didn't know whether

14

any crime had been committed at all. Further, all OGLE had was unconfirmed hearsay from a neighbor and 911 dispatcher OGLE never took the time to gather information or discover facts. As RAKUN bleeds out on his front porch, OGLE never tries to question him, nor conduct any kind of act investigation.

**(15)** OGLE called the E.M.S. Within a few minutes, the E.M.S. does arrive. By this time, RAKUN's condition is critical. RAKUN is dying and has to be flown to the hospital via a helicopter. RAKUN is flown to Knoxville, where he undergoes 2 emergency surgical procedures in 3 days. Further surgery is performed later that Summer.

**(16)** While RAKUN is recovering, RAKUN is "under Deputy Guard." A Sevier Sheriff's Deputy is permanently seated at RAKUN's hospital bed. These Deputies allowed RAKUN no contact with the outside world. In fact, RAKUN's daughters came to bring his insurance information and medical records. They were thrown out of the hospital. The Sevier Deputies would not permit RAKUN to make or receive phone calls either. RAKUN was under an actual arrest—though labeled "the world's longest *Terry v. Ohio*, 392 U.S. 1 (1968) detention."

## LAW ENFORCEMENT ACTORS: FACTUAL ALLEGATIONS

**(17)** OGLE had no lawful basis to arrive at RAKUN's house on July 13, 2021 to "detain," seize, or arrest RAKUN. OGLE had scant hearsay accounts from third parties about the events at RAKUN's house. Even then, the initial reports were that the situation had quelled and Barret and Alexis were far removed from the premises. Further, there were no reports of gunplay involving RAKUN. It was clear to OGLE that Barret was not injured badly, or at all. OGLE didn't know what RAKUN looked like, didn't know his race, his build, or general appearance. In fact, OGLE wasn't even sure who lived at 3304 Robeson. OGLE remarked on video he thought it "was a rental house." OGLE had no lawful basis to utilize deadly force as a first option under circumstances where there was no one in distress or danger. OGLE had no lawful basis to

15

conduct a warrantless criminal inquiry on RAKUN's front porch—part of his curtilage. The 911

dispatcher conveyed the message that RAKUN **was unarmed** and the family crisis had abated.

Furthermore, any alleged family crisis had occurred about **1 hour** before OGLE actually arrived.

**(18)** Deputy CATES had no lawful basis to trespass into RAKUN's backyard. CATES and

CULOTTA had no more information than OGLE possessed. CULOTTA had no lawful basis to

trespass and enter RAKUN's backyard. The duo climbed over a wooden front face to get there.

CULOTTA effectively created a crime scene by extracting sundry bullets from RAKUN's pant

pockets and sprinkling them on the front porch. The rounds were not detonated at OGLE, nor at

any time law enforcement was present on July 13, 2021. TBI Agent ALLEN later documented

the rounds deposited by CULOTTA in situ. ALLEN depicted a scenario insinuating that RAKUN

deposited the rounds after discharging weapons on his porch. RAKUN's deer rifle had fallen

from his hands, and was mostly within RAKUN's living room. CULOTTA kicked the weapon so

it fell completely out of the house, and in a different 180 direction. None of the first 3 responders

documented or took possession of RAKUN's deer rifle.

**(19)** Sevier County Sheriff's Detectives ROBBINS and HUDDLESTON roamed RAKUN's

property after he was transported to the hospital in Knoxville. ROBBINS arrived first, and

ducked under the crime scene tape. ROBBINS peeked inside RAKUN's vehicles and cast his

gaze towards RAKUN's home. HUDDLESTON arrived after ROBBINS. ROBBINS and

HUDDLESTON physically entered RAKUN's home without a warrant and conducted a search.

This is true because neither CATES nor CULOTTA saw or documented a dead dog. However,

ROBBINS and HUDDLESTON mentioned this on video. The only way they could have such

knowledge was to kill the animal themselves, or to conduct a warrantless search of RAKUN's

home. It appears the animal was killed by a police-type hollow point round. The animal was

killed from a high velocity pistol round—not a high-powered rifle. None of the first responders

16

saw or reported a dead dog. The fragments taken from the dog's chest indicated a "mushroom" type shard indicative of a hollow point expansion. A rifle round would have left different characteristics. A rifle round would have made a small entry hole, and a cavernous exit wound. A rifle round would also have greatly damaged the concrete floor in the garage. The wounds in the dog indicated a cavernous entry wound, mushroomed projectile fragments, and no exit wound.

**(20)** CATES, CULOTTA, and OGLE worsened RAKUN's spine and arm bullet wounds by piling onto his arms and back. The 3 forcefully turned RAKUN over and around—and pressed him face-first on the front porch. They then piled onto RAKUN, pressing down on his spine with their knees and body weight. RAKUN's injured arms were twisted and contorted behind his back to handcuff him.

**(21)** As stated earlier, RAKUN had round the clock Sevier County Deputies as guard chaperones in the Knoxville Hospital. They confined RAKUN, and prevented any citizen from contacting RAKUN. Further, RAKUN could not make phone calls, nor receive them from anyone. RAKUN's relatives had no idea how he was, or where he was. RAKUN was under a de facto arrest, despite OGLE's statement RAKUN was under a *Terry v. Ohio,* 392 U.S. 1 (1968). detention. RAKUN was not allowed to have contact with anyone other than law enforcement or the Hospital staff.

**(22)** So, for about 3 weeks, RAKUN was not allowed ANY contact with the outside world. After about 3 weeks, a Deputy Guard permitted RAKUN to make a brief call to his biological sister, Tabitha King. Even then, RAKUN only had time to tell her of his whereabouts, and his plight. RAKUN could not communicate with any Attorneys, nor seek Hospital care of his own choice. The Hospital staff at the University of Tennessee Medical Center at Knoxville did not permit RAKUN any outside contact with the world, the public, or relatives either. Alexis and Brittany Rakun went to see RAKUN at the Knoxville Hospital on August 17, 2021. They brought medical

17

records, medications, and insurance documents. The Sevier Deputies and Hospital staff forbade them from contacting RAKUN at all. Alexis and Brittany Rakun were "thrown out" of the premises by Hospital Police. As Alexis was leaving, she exchanged words and gestured with Hospital Police. They responded by tackling Alexis on the concrete, handcuffing her, and arresting her. Alexis Rakun was charged by Hospital Police with Criminal Trespassing and Resisting Arrest. These Misdemeanor charges were thrown out by a Judge in Knoxville.

(23) This "detention" occurred from July 13, 2021 through the 3rd week of August 2021. On August 5, 2021, HUDDLESTON sought and obtained arrest warrants for various family violence charges against RAKUN. Later, in the 3rd week of August 2021, RAKUN was handed papers which indicated he was under formal arrest. However, in practice, nothing changed. RAKUN had been the recipient of a de facto arrest since July 13, 2021. HUDDLESTON had no more probable cause on August 5, 2021 than July 13, 2021. HUDDLESTON's arrest warrant application misled the Magistrate because the law enforcement body camera footage refutes the allegations against RAKUN. Outtakes from Deputy Pillar's cage camera and audio reveal the true motives of RAKUN's children in calling 911. The true desire of Alexis and Barret Rakun was to seize RAKUN's valuables, money, and credit cards. With RAKUN out of the way in Jail, Hospital, or dead—this would certainly be possible. Alexis and Barret Rakun whispered about RAKUN's safe and obtaining the contents. Barret also admitted he bumped into objects on the wall during the tussle. Barret had displayed his knife on the wall of his room.

(24) In the 3rd third week of August 2021, RAKUN was discharged from the University of Tennessee Hospital at Knoxville. Immediately, RAKUN was transported to the Sevier County Jail. RAKUN remained an inmate at the Sevier County Jail until early September 2021. During his stay in the Sevier Jail, RAKUN experienced abominable medical care and neglect. As an instant matter, RAKUN still had critical conditions, Indeed RAKUN still had bullets in his body.

18

The Sevier Jail could not address such acute care conditions. In fact, it did not address nor attend to RAKUN's medical needs. RAKUN was prescribed a bevy of medications at the Knoxville Hospital. During his stay at the Sevier Jail, several of these prescriptions expired. The Sevier Jail was made aware of this medical crisis. Yet, the staff at the Sevier Jail took no action, Thus, RAKUN largely spent his time at the Sevier Jail needing vital medications to combat infection, to regulate his organs, and to combat intense pain. As a result, RAKUN's first counsel, Scott Lanzon, and RAKUN's relatives, found RAKUN in a comatose stupor upon visitation. RAKUN's medical conditions had worsened since his arrival at the Sevier Jail. RAKUN would likely die if he didn't receive superior medical help.

**(25)** RAKUN's kin made efforts to bail him out of Jail. As RAKUN's family began such efforts to raise the bail, State Attorney General Prosecutor James Dunn filed formal charges against RAKUN on August 30, 2021. These included charges alleging the homicide of OGLE, and family violence charges against RAKUN's children. There was also a charge of animal cruelty, and leaving the scene of an accident.

**(26)** It's most curious in all of the criminal charges lodged against RAKUN, there is no citizen complainant. Rather, the State of Tennessee is the de facto complainant. No citizen signed or filed sworn criminal complaints. OGLE is supposedly a victim, yet filed no criminal charges. Certainly, RAKUN's children never pursued criminal charges against him, nor ever inquired about these matters again.

**(27)** It's most curious that no first responder—OGLE, CULOTTA, and CATES, never drafted any reports, never documented the event in writing, nor drafted written summaries of their actions on July 13, 2021. It's most curious there are no reports from any first responder documenting supposed evidence or items they recovered or discovered at RAKUN's house on July 13, 2021.

19

## ADDITIONAL LAW ENFORCEMENT MALFEASANCE FACTS

**(28)** When these events broke out, State's Attorney General Prosecutor DUNN requested the Tennessee Bureau of Investigation "look into the lawfulness of OGLE's shooting of RAKUN." Therefore, it had certainly been considered that OGLE's use of deadly force against RAKUN was illegal. So, there was supposed to be an objective and separate inquiry apart from any criminal investigation of RAKUN. In practice though, the TBI and Sevier County Sheriff's Office worked in conjunction to "frame" and falsely accuse RAKUN. In fact, the TBI agents were present at RAKUN's home prior to obtaining a Search Warrant, and during the implementation of the Search Warrant itself. Thus, the TBI Agents were actively seeking (or manufacturing) evidence to prosecute RAKUN. Further, the Tennessee Bureau of Investigation released several media statements. The problem: these statements gave a false factual narrative, and the accounts kept changing. The TBI had already made up its mind from the inception that RAKUN had committed felony crimes. The TBI lost sight of its purpose to investigate the conduct of OGLE.

**(29)** ALLEN drafted a TBI Report in the Summer of 2021 where he painted the inference that RAKUN had assaulted OGLE and menaced him with a rifle. The body camera video clearly refutes this. ALLEN even hinted that RAKUN's rifle discharged. This did not and could not happen because there was no telltale muzzle flame, nor a 170 decibel retort. This is a false and intentionally deceptive report. ALLEN states 5 pistol rounds were found on RAKUN's porch. And, a spent rifle case (RAKUN's). Remember, CULOTTA had taken shells out of RAKUN's pockets and sprinkled them on the front porch. In OGLE's body camera images, there were no shells of any type on RAKUN's porch before OGLE arrived. RAKUN could not have ejected any shells from his rifle. After the first shot by OGLE, RAKUN is seen tumbling out of his house— backwards. RAKUN ends up on his back, sprawled on the front porch. RAKUN's rifle

20

is mostly still inside his living room. Again, there were no rifle cartridges on RAKUN's porch at this juncture. Any rifle cartridges came via Deputy CULOTTA. Thus, ALLEN is intentionally fabricating a false factual narrative based upon fabricated evidence.

**(30)** In ALLEN's TBI Report on the RAKUN shooting, none of the first responders gave a written statement. In fact, ALLEN requested OGLE, CATES, and CULOTTA give a formal statement on what happened at RAKUN's home, and the nature of RAKUN's shooting. OGLE, CATES, and CULOTTA **refused to give any statements, and hired Attorneys.** Thus, ALLEN's TBI Report had no formal statements from anyone. ALLEN overlooked this curious refusal of the 3 first responders to participate, and painted a false account that RAKUN committed felony offenses against OGLE.

**(31)** SANDERS applied for the Search Warrant of RAKUN's home. It's not quite clear what SANDERS relied upon to obtain his "facts" for his Search Warrant. This is so because OGLE, CATES, and CULOTTA had no further role or function in the progression of this case. OGLE, CATES, and CULOTTA did not draft any written reports or documents of the events on July 13, 2021. In paragraph 30 above, OGLE, CATES, and CULOTTA refused to give any statements. Regardless, SANDERS drafted a constitutionally inadequate, rambling, and "general search warrant." SANDERS sought anything "remotely linked to the commission of crimes." SANDERS also sought anything "that could serve as a weapon used in the commission of crimes." In reality, a cheap Bic pen could be used as a deadly weapon. SANDERS sought ALL of RAKUN's firearms and apparently, personal and sporting goods that had nothing to do with weaponry.

**(32)** SANDERS sought, and seized, all of RAKUN's service, hunting, and sporting firearms. Remember, RAKUN had been a Texas Peace Officer for 27 years. A such, he was required to possess firearms. Further, RAKUN's neighbor Donnie Henry stated he never saw or heard

21

RAKUN discharge a weapon on July 13, 2021. And, Henry was a nosy neighbor. Also, RAKUN tumbled out of his house with a Mauser styled 30'06 rifle. Thus, seizing any and all firearms was excessive and not related to criminality. One problem with this "all or nothing" approach was that there was no specificity as to what type of weapon SANDERS sought, and how it was used in crime on July 13, 2021. Another problem was that most of the weapons SANDERS seized from RAKUN's home **were still in storage.** Most of RAKUN's weapons were still boxed and crated from the migration from San Antonio in the Spring of 2021. Thus, these weapons had not been used by RAKUN since he lived in San Antonio. Moreover, most of the weapons had not been used for several years. Thus, SANDERS sought anything which could discharge bullets—without specificity. Also, SANDERS took and seized mundane household possessions like sports bags, plastic cups, and other items which had no connection to weaponry.

**(33)** SANDERS didn't, and had no reason to mention RAKUN's pickup truck in his Search Warrant. RAKUN's truck was locked and parked on RAKUN's curtilage. SANDERS found the keys to the truck, opened it, searched inside, and took a pistol from inside the truck. There was no mention of the pickup truck in the Warrant, much less how its contents were used in criminality.

**(34)** Certainly, SANDERS didn't mention a small portable safe in his Search Warrant. This safe housed RAKUN family heirlooms, jewelry, valuables, and precious metals. One could tell by jostling the safe it contained personal possessions, and not firearms. It's not likely a safe itself could be used as a weapon, and certainly not anything used to injure Barret. The safe was not listed as a type of evidence, or linked to any criminality. This is prima facie proof that SANDERS' Search Warrant was broad, overreaching, and illegal.

**(35)** SANDERS seized several firearms that had no trace to criminality, **and were not documented** as being seized in the Search Inventory. RAKUN had to review the possessions

22

which were seized and taken. RAKUN's tally differed from the law enforcement Inventory. Further, these seized firearms were not mentioned in SANDERS' Search Warrant as existing or being used in crimes.

**(36)** Also, there was no mention of dead animals, bodies, or cadavers to be seized in SANDERS' Search Warrant. CATES and CULOTTA did not see or document the presence of a dead dog in RAKUN's house. That goes back to ROBBINS and HUDDLESTON conducting an illegal entry and search prior to the issuance of SANDERS' Search Warrant. Certainly, there was no prior mention of dead animals or bodies to be seized. For what it's worth, it appears the dog was killed by a police-type hollow point. CATES and CULOTTA didn't find such a body; likely because ROBBINS or HUDDLESTON killed it.

## PROSECUTORIAL·FACTS OF MALFEASANCE

Paragraphs (1-36) in Section VI are incorporated and adopted in their entirety.

**(37)** DUNN is the regional State's Attorney General Prosecutor. DUNN beckoned TBI to assess the legality of OGLE's shooting of RAKUN on July 13, 2021. Law enforcement serve the Tennessee Attorney General's Office. All of the law enforcement investigative files are at the command of the Tennessee Attorney General. DUNN readily accepted the provably flawed and invalid TBI Report from ALLEN on the RAKUN Shooting. DUNN viewed video evidence which did not depict criminality from RAKUN. DUNN made a determined effort to initiate and instigate false charges against RAKUN to distract from the law enforcement malfeasance of OGLE and others.

**(38)** DUNN fabricated evidence and theories by initiating criminal charges that RAKUN shot at, or menaced OGLE with a firearm on July 13, 2021. OGLE's video clearly depicts RAKUN's weapon was not discharged. OGLE's video depicts he did not identify himself as law enforcement. OGLE's video depicts he positions himself at an angle so RAKUN cannot know

23

who is at the door. OGLE's video depicts CULOTTA placing spent bullet casings on RAKUN's front porch. OGLE's video depicts he gave the command for RAKUN to "step out," not "drop the weapon."

**(39)** DUNN took the steps to become an "investigator" of sorts in RAKUN's travails. It's not normal for a Prosecutor to direct tangential reviews of ongoing criminal matters. It's not normal for a Prosecutor to take a special interest in a case and direct its investigation. DUNN summoned and ordered the Tennessee Bureau of Investigations to become involved in RAKUN's situation. Further, upon information and belief, it is apparent that DUNN ordered the TBI to reach its conclusions. It's not normal for any Prosecutor to create false charges and theories which are clearly refuted by video evidence. DUNN's finished product produced false allegations and charges of assaultive conduct against OGLE by formally charging RAKUN on August 30, 2021. The most serious charge was the Attempted Murder of a Tennessee Peace Officer.

**(40)** DUNN had to act as his own investigator—because the 3 first responders didn't produce any written reports or participate in the case. OGLE, CATES, and CULOTTA didn't participate in the RAKUN matter any further after shooting him and calling EMS. ALLEN purportedly only investigated the allegations concerning OGLE and RAKUN. The allegations of family violence weren't covered. Therefore, DUNN made up his own facts and evidence when he filed charges against RAKUN related to Family Violence. DUNN manufactured evidence when he claimed RAKUN shot at his children. The alleged victims never said that. RAKUN's kids claimed they heard shots, but didn't know where they were coming from, or what they were aimed at. DUNN manufactured evidence when he claimed RAKUN stabbed Barret with a knife. The EMS technician smirked at Barret's "injuries," and correctly predicted that 1 stitch would address it. Barret is heard in Deputy Pillar's video stating his knife was on the wall. Further, that he bumped into something on the wall with his back.

24

**(41)** DUNN has directed the Sevier Prosecutors to stall, delay, obstruct, and thwart the transmission of Discovery materials under *Brady v. Maryland,* 373 U.S. 83 (1963). RAKUN didn't receive the telltale OGLE video until February 5, 2025. RAKUN hasn't even received mundane Sheriff's Reports or key investigative files. There is NO written account of any first responder participant, or any subsequent law enforcement documenting their conduct. DUNN's commands have promoted and fostered false criminal allegations. DUNN's commands have thwarted RAKUN's ability to proffer a criminal defense. DUNN's commands have deliberately constricted the flow of information which RAKUN is guaranteed under the 6th and 14th Amendments as a criminal defendant. DUNN has filed a "delaying" prosecution which has never moved to litigate this case. Rather, the intent is to protect corrupt law enforcement officials, and place RAKUN's life and freedom in limbo.

**(42)** MURPHY is the main obstructor as far as criminal evidence is concerned. MURPHY has repeatedly stated certain files "don't exist," which later turn up. MURPHY has manned a Prosecution against RAKUN which he knows is baseless. The proof is in the law enforcement videos. The video content refutes the State's criminal theories. Instead of dismissing baseless charges, MURPHY has willfully delayed the proceedings in CR28846. MURPHY has obstructed RAKUN's *Brady* rights to the Prosecution's so-called evidence. MURPHY constricted the flow of *Brady* files and released useless information. No video or electronic evidence was released until February 5, 2025—3 ½ years after the events in question. Even then, much more video evidence exists which has not been provided.

**(43)** The proof that MURPHY and DUNN have either destroyed or concealed incriminating evidence of law enforcement malfeasance is shown by a call log given to RAKUN's first Attorney, Scott Lanzon. The document demonstrates that 13 Sevier Deputies responded to RAKUN's residence on July 13, 2021. Add Detectives HUDDLESTON and ROBBINS. Add

25

several TBI Agents. Also add Tennessee Troopers who arrived at RAKUN's home. All total, approximately 20 Tennessee Peace Officers were present at RAKUN's home on July 13, 2021. At least 20 Peace Officers—possibly more arrived at RAKUN's home. Therefore, these Peace Officers would have: (1) body camera footage; (2) dash camera footage; (3) cage camera footage; (4) official reports of their activities; (5) 911 calls with dispatchers. Only a trace and trickle of such evidence has been produced. Sevier County Policies confirm that Deputies are required to have, and to turn on their personal body cameras. OGLE's near execution of RAKUN proves that Sevier Deputies have personal body cameras. OGLE's "Mad Max" driving impersonation confirms that all Sevier Sheriff Cruiser have dash cameras. Deputy Pillar's cage camera footage and audio of Alexis and Barret Rakun's compromising statements proves that Sevier Cruisers have cage cameras.

**(44)** Proof that MURPHY and DUNN have known they assert false claims against RAKUN is a DNA Report from 2023. The State sought biological samples from Barret Rakun's knife. The Tests came back indicating: (1) RAKUN's fingerprints **were not on the knife;** (2) RAKUN's **DNA is not on the knife;** and (3) **Barret's blood is not on the knife.** This coincides with Barret whispering in Piller's cage camera "he bumped into something." It also matches his 1 stitch wound. Incidentally, the results of this 2023 Report were not given to RAKUN until 2025. Barret was not stabbed at all, much less by RAKUN.

**(45)** MURPHY has adopted and proliferated DUNN's manufactured evidence of assaultive conduct against OGLE. MURPHY has adopted and proliferated DUNN's manufactured evidence of assaultive conduct against Barret and Alexis Rakun. The State of Tennessee has vindictively charged RAKUN with false crimes, in the hopes of concealing governmental malfeasance. The State has never tried to prosecute these claims. Through DUNN and MURPHY, the State of Tennessee has attempted to railroad RAKUN, and conceal the aggravated assault committed by

26

Deputy Chad Ogle.

## FACTUAL ALLEGATIONS ABOUT SEVIER COUNTY, TENNESSEE

Paragraphs (1-45) in Section VI are hereby adopted and incorporated in their entirety.

### FAILURE TO SCREEN IN HIRING

**(46)** SEVIER hired, employed, and trained OGLE, CULOTTA, CATES, HUDDLESTON, and ROBBINS. The manner in which the Deputies acted indicates they followed their training and official Sevier policies pursuant to *Monell v. New York City Dept. of Soc. Svcs.*, 436 U.S. 658 (1978).

**(47)** SEVIER fails to properly screen and assess the Deputy candidates it hires. SEVIER utilizes low standards, and retains individuals who aren't qualified or suited to law enforcement. For example, OGLE has a G.E.D. education, was a used car salesman, and entered law enforcement after 40 years old. These reduced standards result in violent, gung-ho Deputies akin to the "Tackleberry" character in 'Police Academy.' Further, OGLE has misdemeanor convictions which indicate moral turpitude. Writing a 'hot check' indicates willful theft. Virtually all of the Sevier Deputies seen in the videos seem second rate. Second rate in the sense they are overly aggressive, and not knowledgeable about the Constitutional rights of citizens. Any proper review would have rejected the application of OGLE, who had an undistinguished civilian resume, a low education, and sought a law enforcement career in middle age. Also, a proper review would have associated convictions for 'hot checks' as an indication of moral turpitude.

### DEFECTIVE SEVIER USE OF FORCE TRAINING

Paragraphs (1-47) in Section VI are hereby adopted and incorporated in their entirety.

**(48)** SEVIER fails to properly Train its Deputies on the Uses of Deadly Force. OGLE instinctively sought to provoke a deadly shootout, without even knowing if RAKUN had committed any crimes. OGLE sought to initiate a firearm shootout in the absence of any crisis,

27

danger, or hostility. OGLE commanded RAKUN to "step out." A better command would have

been an instruction for RAKUN to "drop his weapon." OGLE created the circumstances where

he felt compelled to use deadly force. OGLE continued to shoot RAKUN even after RAKUN

had dropped the rifle and tumbled out of his home. In fact, after OGLE's first shot, RAKUN no

longer possessed the rifle in his hands. Deadly force is only to be used as a last resort—not a first

option. SEVIER doesn't require Deputies to draft reports or give statements when they do shoot

the public. The result is any objective inquiry is stymied, and miscreant Deputies evade justice.

OGLE, CULOTTA, and CATES were not ordered to draft reports of their conduct, or what they

did and observed. By Tennessee law, OGLE would have been required to document his actions

on July 13, 2021. These 3 first responders would not cooperate with TBI because they were

afraid of criminal repercussions. OGLE should have been ordered by SEVIER to draft a *Garrity*

*v. New Jersey,* 385 U.S. 493 (1967) statement. SEVIER didn't order such a statement because it

wanted OGLE and itself to evade criminal and civil liability.

### DEFECTIVE SEVIER 4th AMENDMENT TRAINING

Paragraphs (1-48) in Section VI are hereby adopted and incorporated in their entirety.

**(49)** SEVIER fails to properly Train its Deputies on 4th Amendment principles, such as

"reasonable suspicion," "probable cause," *Terry v. Ohio,* 392 U.S. 1 (1968), exigent

circumstances, warrantless searches, warrantless seizures, "Protective Sweeps," evidence

collection and 'the chain of custody.' OGLE thought he could rely on triple hearsay, and conduct

no fact-finding to shoot and seize RAKUN. OGLE had no personal information, and didn't try to

obtain any. OGLE didn't even know what RAKUN looked like, or who he actually shot. OGLE

wasn't trained that 911 dispatches are related to *Terry* stops. Such encounters depend upon fresh

factual information. By the time OGLE arrived, it had been almost an hour since RAKUN and

Barret jostled off the walls. OGLE had no personal knowledge any crimes had actually been

28

committed. He never attempted to find out.

**(50)** OGLE didn't know there is a thing called **"chain of custody."** It means if Police purport to seize and use evidence of crimes, they have to document where an item was found and who preserved it. RAKUN's deer rifle wasn't evidence of anything. In so far as law enforcement claims it was used in criminal conduct, OGLE didn't safeguard it, nor document how the item came into view. This reflects on poor SEVIER Training. Further, there is no video or report of **WHO** actually took possession of the rifle and worked its mechanism. We don't even know if the weapons they claim belong to RAKUN actually do—because of **no documented chain of custody.** Since OGLE was the first Sevier Deputy to have interactions with RAKUN, he would have need to have done the lion's share of the chain of custody documentation. As we understand it, OGLE created no written documents or statements of the events on July 13, 2021. In fact, the other first responders purport to have discovered items and evidence—but didn't account for it. CULOTTA removed bullets from RAKUN's pockets and sprinkled them on his front porch, but didn't seize them, or tell ALLEN he deposited those bullets. In effect, CULOTTA created his own purported "crime scene."

**(51)** SEVIER didn't train OGLE, CULOTTA, or CATES that 911 calls can produce a category of citizen contacts called *Terry* **stops**. These are brief detentions based upon articulable facts a crime has been committed. But, the information must be fresh, and depict criminality. No Deputy spoke with Alexis or Barret at this point. A third party actually called 911; that was Connie Brown. Even then, Brown depicted a hearsay account which indicated the kids were removed from RAKUN's home, and the situation had quelled. None of the 3 first responders had a legal basis to detain RAKUN based upon the passage of time (about 1 hour) since RAKUN and Barret scuffled, and the lack of factual information a crime was in progress. As the 3 arrived, there were no gunshots, no distress, no screaming, and no injuries. Anything that occurred after

29

the immediate arrival of OGLE, CATES, and CULOTTA violated the 4th Amendment.

**(52)** SEVIER didn't train OGLE, CATES, or CULOTTA on **exigent circumstances**. These are situations which represent an emergency where lives are in danger. The 3 first responders knew Alexis and Barret Rakun had left the house. They knew that Barret's "injuries" were minor or nonexistent. The 911 call didn't claim there had been gunfire by RAKUN. The 911 call occurred at least 30 minutes after the incident. It took OGLE over 20 minutes to make the scene. Thus, OGLE arrived 1 hour after the incident concluded. There was no "emergency" at RAKUN's house on July 13, 2021. Especially, when OGLE arrived. The 3 Deputies created their own emergency scenario. This included the illegal entry and search by CATES and CULOTTA which lasted 72 seconds. There could be no valid protective sweep because **there was no lawful arrest.** SEVIER called it a "detention." That doesn't give law enforcement the right to enter a home and search for evidence and weapons. CATES and CULOTTA weren't searching for people in distress. They believed RAKUN was alone. RAKUN was shot and handcuffed on his front porch. The 911 dispatcher had stated RAKUN was unarmed in the broadcast.

**(53)** SEVIER didn't train OGLE, CATES, or CULOTTA on **"probable cause"** to arrest or search. "Probable cause" to arrest means a modicum of personal factual information someone has committed a criminal offense. "Probable cause" to search sometimes permits brief searches incident to a lawful arrest. For example, a suspect who has been lawfully seized may be searched for weapons. Probable cause for a warrantless arrest does not permit warrantless searches of homes or "sneak peeks" of evidence. None of the 3 first responders **had any factual knowledge**. OGLE, CATES, and CULOTTA had no personal knowledge crimes had been committed by RAKUN. Even then, they were aware the family crisis had long been dissipated. There was no probable cause to seize RAKUN. RAKUN **was arrested** on his front porch. RAKUN was not "free to leave" or disregard the Deputies. RAKUN had a continuous Sevier Deputy guard from

July 13, 2021 through August 18, 2021. **That is the world's longest *Terry* detention.** *Terry* detentions are limited in scope, and time of about 20 minutes, *United States v. Sharpe,* 470 U.S. 675 (1985).

**(54)** SEVIER didn't train CATES, CULOTTA, HUDDLESTON, or ROBBINS on the requisites on a legal search of home. No one told CATES and CULOTTA they couldn't trespass and enter into RAKUN's yard over a front fence. No one told CATES and CULOTTA they couldn't conduct an illegal entry and 72 second search of RAKUN's home. It was an illegal search. Likewise, it was an illegal protective sweep. CATES and CULOTTA knew RAKUN was alone at that point. No one told CULOTTA he couldn't remove ammunition from RAKUN's pockets and sprinkle them on the front porch as evidence. Albeit, false evidence. Those rounds were not discharges in the Deputies' presence. No one told HUDDLESTON and ROBBINS, they couldn't conduct a search of RAKUN's home without a warrant. These two entered RAKUN's home long before a search warrant was obtained. This is so because HUDDLESTON and ROBBINS spoke of the dead dog. Neither CATES nor CULOTTA had seen one, or reported one. Thus, HUDDLESTON and ROBBINS either killed the dog themselves, or entered RAKUN's property without a warrant. In either scenario, it was an illegal search. No one told ROBBINS and HUDDLESTON that valid searches of homes requires specific facts linking items at the home to crime. There has to be a direct, plausible link. Common household goods like sporting bags and portable safes have no link to crime because they cannot serve as weapons. No one told HUDDLESTON and ROBBINS a search of a home is limited to the parameters of the Search Warrant. RAKUN's locked vehicle was searched (and wasn't mentioned in the warrant). No one told HUDDLESTON and ROBBINS they can't abscond with family heirlooms in a portable safe. This safe is kept apart from the items seized by TBI. The Tennessee Attorney General's Office concedes these and other items were illegally taken in CR28846. No one told

31

HUDDLESTON and ROBBINS that they couldn't seize just **any firearm** RAKUN owned, Rather, they were limited to guns RAKUN may have used on July 13, 2021. **All** of RAKUN's guns were seized. This included sporting guns and guns which were still in storage on July 13, 2021.

### POLICY, CUSTOM, OR PRACTICE OF EXCESSIVE FORCE

Paragraphs (1-54) in Section VI are hereby adopted and incorporated in their entirety.

**(55)** SEVIER allows its Deputies to wield excessive force against the public that is not justified. This includes the gratuitous use of deadly force, and the applications of unnecessary physical force. Under this practice, Sevier Deputies may use any type of force against the public without recourse or accountability. OGLE resorted to deadly force via a firearm as his first choice. When OGLE arrived, there was no one in distress, and no crimes in progress. Further, SEVIER didn't demand or require a formal account from OGLE on his uses of force against RAKUN. OGLE didn't even have to draft mundane Sheriff's Reports, much less explain his shooting of RAKUN. OGLE refused to give a statement to TBI. Instead, OGLE hired a lawyer. OGLE. CATES, and CULOTTA used excessive physical force against RAKUN. These 3 jumped on RAKUN's already severed L3 vertebrae when handcuffing him. These 3 twisted and contorted RAKUN's bleeding and injured arms to handcuff him. RAKUN couldn't respond to the Deputies' commands because his body was beginning hemorrhagic shock, paralysis, and respiratory failure. When OGLE, CATES, and CULOTTA jumped on RAKUN's spine and arms, it worsened the existing trauma to them by compressing tissue pierced from hollow point bullets.

### SEVIER COUNTY'S FAILURE TO SUPERVISE

Paragraphs (1-55) in Section VI are hereby incorporated and adopted in their entirety.

**(56)** SEVIER allows its Deputies to conduct illegal arrests, illegal searches, plant evidence, and use unwarranted force against the public. This comes from a Deputy pool with little or no education, and dubious credentials. SEVIER Deputies and personnel were permitted to roam

32

around RAKUN's home on July 13-14, 2021, plant evidence, steal RAKUN's heirlooms, and fail to document their conduct in the supposed criminal investigation. SEVIER doesn't require its Deputies to draft formal reports about events, investigations, or uses of force. This results in unlawful arrests, illegal searches, illegal seizures, and danger to the public. SEVIER Deputies were allowed to use deadly force against RAKUN, and not even provide a justification or written account. SEVIER Deputies were allowed to 'detain' RAKUN for 35 days, and confine him in a hospital. SEVIER Deputies forbade contact with the outside world, with RAKUN's personal doctors, with RAKUN's family, and legal counsel. SEVIER Deputies do not have to explain or account for their conduct, as they are not required to produce formal statements of their law enforcement activities.

## SEVIER'S FAILURE TO DISCIPLINE

Paragraphs (1-56) in Section VI are hereby incorporated and adopted in their entirety. **(57)** The conduct in paragraphs (1-56 above) depicts lawlessness. How was OGLE rewarded for his attempted homicide of RAKUN? OGLE is running for Sevier Sheriff! SEVIER Deputies are not disciplined for illegal and injurious conduct towards the public. The public can be attacked, searched, seized, and indefinitely "detained" by SEVIER Deputies. All of this with the sanction of policymakers. RAKUN was shot, seized, searched, roughed-up while critically wounded, had his property stolen, and framed. SEVIER Deputies planted evidence (CULOTTA), and are not required to give formal statements or reports on critical incidents. SEVIER allows its Deputies to conduct illegal arrests, illegal searches, plant evidence, and use unwarranted force against the public. SEVIER doesn't require its Deputies to document their "criminal investigations" or official activities through written reports. After the 3 first responders turned off their body cameras, there is no official record of their conduct. Thus, SEVIER Deputies answer to no one. Apparently, SEVIER Deputies don't even answer to the Tennessee Bureau of Investigation. OGLE, CULOTTA, and CATES refused to participate in the TBI inquiry into the RAKUN

33

shooting.

## SEVIER'S POLICY OF UNLAWFUL SEIZURES AND DETENTIONS

Paragraphs (1-57) in Section VI are hereby incorporated and adopted in their entirety.
**(58)**

It is undisputed RAKUN was shot, seized, restrained, and handcuffed on July 13, 2021. It is

undisputed RAKUN was seized on minimal or no information by OGLE. It is undisputed

SEVIER categorized RAKUN's seizure as a "detention." *Terry* detentions are limited in scope

and duration. *Terry* detentions require a "reasonable suspicion" criminal activity is afoot. OGLE

had none of that. The 911 dispatch indicated RAKUN was unarmed, and any situation had

abated. The alleged victims were down the street. It is undisputed RAKUN had a constant guard

from July 13, 2021 through August 18, 2021 when he was released from the Knoxville Hospital,

and transferred to the Sevier County Jail. It's apparent this is a routine SEVIER practice. Citizens

and suspects are confined and restrained by SEVIER Deputies until such time as they are

formally arrested. The University of Tennessee Hospital at Knoxville staff were told that

RAKUN was not to have contact with the outside world. No visitors, or phone calls were

allowed for any reason. The Hospital staff certainly complied—arresting daughter Alexis Rakun.

RAKUN's "detention" holds the world record under *Terry v. Ohio,* 392 U.S. 1 (1968) for

duration (35 days), and illegality. This order and methodology could only have come from

custom or policymakers. It is undisputed that HUDDLESTON procured Arrest Warrants for

RAKUN on August 5, 2021. It is undisputed that RAKUN wasn't served with these Warrants

until August 14, 2021.

## DEPRIVATIONS OF MEDICAL CARE AT THE SEVIER JAIL

Paragraphs (1-58) in Section VI are hereby incorporated and adopted in their entirety.
**(59)**

RAKUN was a "guest" of SEVIER County Jail for approximately 2 weeks. During this time,
RAKUN's medical condition markedly deteriorated. Bear in mind RAKUN's L3 vertebrae was

shattered from a hollow point round by OGLE. Also consider that RAKUN still had bullet

34

fragments in his body. Further, that RAKUN had future surgeries pending that Summer of 2021. Recognize that RAKUN was prescribed medications for these medical perils. These included medications to combat blood clots, medications to combat infection, medications to regulate body functions, and medications for pain. RAKUN's prescriptions ran out while in the SEVIER Jail. RAKUN also had glaucoma, which required medication. RAKUN did not receive pharmaceutical refills in the SEVIER Jail. RAKUN's condition deteriorated as a result. Further, the SEVIER Jail was not an acute care facility. It didn't have the staff or equipment to house an inmate in RAKUN's condition. As a result, RAKUN received no medical care in the SEVIER Jail. RAKUN's relatives visited him, and found him in a coma-like stupor. They realized they would have to bail RAKUN out, or he would die. RAKUN was bailed out in early September 2021. RAKUN was forced to seek out qualified medical treatment upon release.

## SEVIER'S DELIBERATE INDIFFERENCE

Paragraphs (1-59) in Section VI are hereby incorporated and adopted in their entirety.
**(60)** Previous SEVIER Sheriff Ronald "Hoss" Seals was the Final Policymaker for SEVIER County in law enforcement under Tennessee law. Sheriff Seals oversaw Sevier County law enforcement for 14 years, from 2008 through 2022. Under his tenure, he developed policies and practices which permitted Deputies to violate the constitutional rights of the public. These include defects in hiring, Failures to Train on lawful applications of the 4th Amendment, Failures to Supervise, and Failures to Discipline. The SEVIER Sheriff's Office is a small agency **(100 Deputies).** As such, Sheriff Seals had personal knowledge of Deputy misconduct because of the agency's structure. This "deliberate indifference" and disregard for harm to the public directly caused RAKUN's injuries. The responding SEVIER Deputies and Detectives knew they would never be required to explain or justify their actions.

35

## COURSE OF CRIMINAL CASE PROCEEDINGS

**(61)**

For a time in CR28846, RAKUN was acting Pro Se in defending himself. Initial Attorney Scott Lanzon abandoned RAKUN in April 2023. The Court at that time (Judge Henry Ogle), allowed Lanzon to waltz out of the case without justification. His basis: RAKUN had been "rude" to his staff. In reality, Lanzon took RAKUN's money and did very little.

**(62)** So, RAKUN fought hard to defend himself. Lanzon hadn't done much in the way of Motions or meaningful opposition. As a result, RAKUN filed 5 Pro Se Motions on September 15, 2023. These covered a Speedy Trial denial, a Change of Venue, a *Brady* Motion for Discovery, a Motion to Quash the Indictments, and a Motion to Suppress the fruits of the illegal search of RAKUN's home. The State of Tennessee didn't respond at all. Judge Ogle kept delaying the adjudication of RAKUN's Motions. All told, there were at least 7 settings on RAKUN's Motions—which weren't heard.

**(63)** In the Summer of 2024, Judge Ogle had to step down because of illness. Judge Jeff Rader was appointed to replace him. Five, and ultimately, Six Motions, were still pending. Several of these Motions would be dispositive. RAKUN's Motions were not heard, and rescheduled for various reasons beyond RAKUN's control. Curiously, RAKUN had to "file an appearance as a Pro Se Defendant." In this document from August 2024, RAKUN had to prove his competency as a self-represented Defendant. RAKUN was not thought to be insane or mentally incompetent. RAKUN was not disruptive or offensive either.

**(64)** Since the Fall of 2023, RAKUN's several Motions, and dispositive Motions have not been heard or ruled upon. RAKUN is not a crackpot, disruptive, or mentally incompetent. Rather, his Motions are cogent, valid, and powerful. Attorney William Wheatley has since been appointed to represent RAKUN. Counsel Cano also joined RAKUN's criminal defense team in CR28846.

**(65)** The State of Tennessee has "played games" and refuse to produce required *Brady* Discovery

36

items. It should not take 2 ½ years to rule on mundane procedural Motions. It shouldn't take 3 ½ years to produce mundane law enforcement videos and reports. It shouldn't take 50 months to take CR28846 to trial. Cause No. CR28846 **cannot go to trial** because of a lack of *Brady* Discovery. RAKUN's *Brady* Motion requested approximately 170 items from the State. **It is still pending**, because it has not been substantially fulfilled. Under *Barker v. Wingo,* 407 U.S. 514 (1972), the U.S. Supreme Court stated 1 year is plenty of time to conduct a felony trial.

## HARMS

**(67)** RAKUN is categorized as a "paraplegic" by his Neurologist. RAKUN incurred a partially severed L3 vertebrae. This causes constant, excruciating pain. RAKUN walks with a permanent limp. RAKUN cannot perform the physical feats prior to July 13, 2021. RAKUN cannot run any more. RAKUN cannot lift heavy objects any more. RAKUN cannot even sit still, or lie in bed without experiencing agonizing pain. Some of these symptoms are likely due to malpractice. This is a result of RAKUN's "coerced detention" at the University of Tennessee at Knoxville Hospital. RAKUN **was compelled** to use only that Hospital's staff, physicians, surgeons, and facilities. RAKUN could not consult his own doctors, or seek his own medical solutions. These Knoxville Physicians left bullet fragments in RAKUN's body. One large fragment was left in RAKUN's arm. This missile dropped out of RAKUN's arm in the Spring 2025. RAKUN is not able to work, and would likely be categorized as 100% disabled by the Social Security Administration.

**(68)** RAKUN has his freedoms and liberty constrained by the filing of bogus criminal charges in CR28846. RAKUN cannot leave Sevierville, and RAKUN's life is in limbo. RAKUN had to procure $50,000 cash for his bail. RAKUN squandered money on Attorney Scott Lanzon, who abandoned him. What's truly sobering is RAKUN cannot even "have his day in Court." The State of Tennessee and law enforcement have conspired to delay the criminal process. Probably,

because they know the State has a weak case. The body camera videos refute several theories of criminal conduct by RAKUN.

**VII.**               **42 U.S.C. 1983 LEGAL CLAIMS FOR RELIEF**

Paragraphs (1-68) in Section VI are hereby incorporated and adopted in their entirety.

**A.**                      **DEPUTY CHAD OGLE**

**(1)**                **EXCESSIVE FORCE: DEADLY FORCE**

On July 13, 2021, OGLE used deadly force via a firearm against RAKUN that was: (1) excessive; (2) unreasonable; and (3) unwarranted; and (4) RAKUN suffered grievous harm. RAKUN was shot at 5 times, and struck by 3 bullets. RAKUN nearly died and is now a paraplegic according to his Neurologist.

**(2)**               **EXCESSIVE FORCE: PHYSICAL FORCE**

On July 13, 2021, OGLE used excessive physical force via jumping on RAKUN's shattered L3 vertebrae and wounded arms from gunshots during handcuffing that was: (1) excessive; (2) unreasonable; and (3) unwarranted; and (4) RAKUN suffered grievous harm. RAKUN was shot at 5 times, and struck by 3 bullets. RAKUN nearly died and is now a paraplegic according to his Neurologist. OGLE also twisted and contorted RAKUN's injured limbs while handcuffing him.

**(3)**          **ILLEGAL *Terry v. Ohio.* 392 U.S. 1 (1968) SEIZURE**

On July 13, 2021, OGLE entered RAKUN's property and curtilage without a reasonable suspicion criminal activity had occurred or was in progress. OGLE physically stopped RAKUN via gunfire, and handcuffed him to seize him. This was called a *Terry* seizure by SEVIER authorities which lasted 35 days. No fact-finding had occurred before or after OGLE seized RAKUN. RAKUN was never free to leave after being handcuffed on his porch, as he had a constant Deputy Guard.

**(4)**                      **FALSE ARREST**

On July 13, 2021, OGLE entered RAKUN's property and curtilage without a reasonable

38

suspicion criminal activity had occurred or was in progress. Further, OGLE had no "probable cause" RAKUN had committed any crime. An Arrest Warrant was not obtained until August 5, 2021, and wasn't served until August 14, 2021. OGLE physically stopped RAKUN via gunfire, and handcuffed him to seize him. This was called a *Terry* seizure by SEVIER authorities which lasted 35 days. No fact-finding had occurred before or after OGLE seized RAKUN. RAKUN was never free to leave after being handcuffed on his porch, as he had a constant Deputy Guard.

**(5)**                                  **FAILURE TO INVESTIGATE**

OGLE made **no effort** to determine if RAKUN's children had actually been menaced or harmed. The children had moved approximately ¼ mile down the road, and OGLE decided not to stop and question them. A cursory assessment would have revealed Barret's 1 stitch injury was not from a violent stabbing. A cursory interview would have revealed no person actually saw RAKUN shoot a gun. A brief spate of fact-finding might have revealed what RAKUN actually looked like. OGLE never sought any information from RAKUN before or after shooting him.

**B.**                                  **DEPUTY HUNTER CATES**

**(1)**                   **ILLEGAL/UNREASONABLE WARRANTLESS SEARCH**

CATES twice entered into and onto RAKUN's property without a warrant. (1) This included the first time, hopping over the fence and searching the backyard. (2) The second time included entering into RAKUN's home and remaining there for 72 seconds. CATES had no lawful basis to be on RAKUN's property, no consent, and no warrant.

**(2)**                          **EXCESSIVE FORCE: PHYSICAL FORCE**

On July 13, 2021, CATES used excessive physical force via jumping on RAKUN's shattered L3 vertebrae and wounded arms from gunshots during handcuffing that was: (1) excessive; (2) unreasonable; and (3) unwarranted; and (4) RAKUN suffered grievous harm. RAKUN was shot at 5 times, and struck by 3 bullets. RAKUN nearly died and is now a

39

paraplegic according to his Neurologist. CATES also twisted and contorted RAKUN's injured limbs while handcuffing him.

(3)          **ILLEGAL *Terry v. Ohio.* 392 U.S. 1 (1968) SEIZURE**

On July 13, 2021, CATES entered RAKUN's property and curtilage without a reasonable suspicion criminal activity had occurred or was in progress. CATES helped handcuff RAKUN to seize him. This was called a *Terry* seizure by SEVIER authorities which lasted 35 days. No fact-finding had occurred before or after OGLE seized RAKUN. RAKUN was never free to leave after being handcuffed on his porch, as he had a constant Deputy Guard.

**C.**          **DEPUTY TIMOTHY CULOTTA**

(1)          **ILLEGAL/UNREASONABLE WARRANTLESS SEARCH**

CULOTTA twice entered into and onto RAKUN's property without a warrant. (1) This included the first time, hopping over the fence and searching the backyard. (2) The second time included entering into RAKUN's home and remaining there for 72 seconds. CULOTTA had no lawful basis to be on RAKUN's property, no consent, and no warrant.

(2)          **EXCESSIVE FORCE: PHYSICAL FORCE**

On July 13, 2021, CULOTTA used excessive physical force via jumping on RAKUN's shattered L3 vertebrae and wounded arms from gunshots during handcuffing that was: (1) excessive; (2) unreasonable; and (3) unwarranted; and (4) RAKUN suffered grievous harm. RAKUN was shot at 5 times, and struck by 3 bullets. RAKUN nearly died and is now a paraplegic according to his Neurologist. CULOTTA also twisted and contorted RAKUN's injured limbs while handcuffing him.

(3)          **DUE PROCESS:FABRICATING EVIDENCE**

CULOTTA withdrew shell casings within RAKUN's pants after RAKUN was shot and seized. CULOTTA sprinkled and deposited these shells on RAKUN's front porch to give the

40

appearance that is where they were found, and that RAKUN had discharged his rifle at OGLE, and ejected the shells. ALLEN ran with this false proposition. None of those shells, and some were live, had been discharged by RAKUN while law enforcement was present on July 13, 2021. This fueled the false theory RAKUN had menaced law enforcement with firearms.

(4)     **ILLEGAL *Terry v. Ohio.* 392 U.S. 1 (1968) SEIZURE**

On July 13, 2021, CATES entered RAKUN's property and curtilage without a reasonable suspicion criminal activity had occurred or was in progress. CULOTTA helped handcuff RAKUN to seize him. This was called a *Terry* seizure by SEVIER authorities which lasted 35 days. No fact-finding had occurred before or after OGLE seized RAKUN. RAKUN was never free to leave after being handcuffed on his porch, as he had a constant Deputy Guard.

**D.**     **DETECTIVE DEXTER ROBBINS**

(1)     **ILLEGAL/UNREASONABLE WARRANTLESS SEARCH**

ROBBINS entered into and onto RAKUN's property without a warrant on July 13 2021. (1) This occurred in the period after RAKUN was transported to the hospital, and before a Search Warrant was obtained. (2) ROBBINS physically entered RAKUN's home without a warrant. (3) There was no warrant, no consent, and no exigent circumstances to justify this entry and search.

(2)     **FAILURE TO INVESTIGATE**

ROBBINS made **no effort** to determine if RAKUN's children had actually been menaced or harmed. A cursory assessment would have revealed Barret's 1 stitch injury was not from a violent stabbing. A cursory interview would have revealed no person actually saw RAKUN shoot a gun. A brief spate of fact-finding might have revealed what RAKUN actually looked like. OGLE never sought any information from RAKUN before or after shooting him. ROBBINS made no effort to examine the specter of law enforcement malfeasance. The TBI was conducting a parallel inquiry focusing on OGLE's misdeeds. ROBBINS could not fathom the Deputies'

41

malfeasance was a causation of the criminal charges in CR28846. OGLE's video refutes the charges claiming assault on a Peace Officer lodged against RAKUN.

**E.**       **DETECTIVE JIMMY HUDDLESTON**

**(1)**       **ILLEGAL/UNREASONABLE WARRANTLESS SEARCH**

HUDDLESTON entered into and onto RAKUN's property without a warrant on July 13, 2021. (1) This occurred in the period after RAKUN was transported to the hospital, and before a Search Warrant was obtained. (2) HUDDLESTON physically entered RAKUN's home without a warrant. (3) There was no warrant, no consent, and no exigent circumstances to justify this entry and search.

**(2)**       **ILLEGAL/UNREASONABLE SEARCH EXCEEDING SCOPE OF WARRANT**

HUDDLESTON entered into and onto RAKUN's property with a warrant on July 14, 2021 (1) HUDDLESTON physically entered RAKUN's home with a warrant. (2)  HUDDLESTON searched areas of RAKUN's home not named or mentioned in the warrant. (3) HUDDLESTON took and seized property including a portable safe with heirlooms, and searched locked vehicles not listed in the warrant. (4) HUDDLESTON also seized all of RAKUN's firearms—including those that were clearly still in storage. (5) HUDDLESTON seized personal property, valuables, jewelry, and sporting equipment which had no possible trace to criminal conduct. (6) HUDDLESTON effectively enforced a "general warrant," and took anything he fancied.  (7) HUDDLESTON also failed to document and state the whereabouts of every item he took.

**(3)** ***Franks v. Delaware*, 438 U.S. 154 (1978) FALSE ARREST WARRANT AFFIDAVIT**

On August 5, 2021, HUDDLESTON procured Arrest Warrants for RAKUN on several charges. HUDDLESTON had no probable cause RAKUN had committed any crimes. HUDDLESTON deceived a neutral magistrate and knowingly obtained Arrest Warrants without any legal basis. RAKUN had already been in a de facto arrest since July 13, 2021—as he was not

42

free to leave the Deputies' presence. HUDDLESTON's application on August 5, 2021 is an admission there was no probable cause to seize RAKUN on July 13, 2021.

**(4)** <u>**DUE PROCESS:FABRICATING EVIDENCE**</u>

HUDDLESTON took statements out of context from Alexis Rakun's taped Hospital interview on July 13, 2021 and warped them into a fictional account. For example, Alexis "thought she heard gunshots" as they were leaving RAKUN's house. But, Alexis wasn't sure, and didn't know what they were aimed at. HUDDLESTON took that and turned it into RAKUN shot at his children while they left his home. HUDDLESTON took the reality that Barret bumped into his own knife hung on the wall to incur his 1 stitch back injury, and turned it into RAKUN stabbed Barret with a Rambo knife. Barret intimates the true nature of his booboo in Pillar's cage camera audio; he bumped into his own knife with has back. These theories are patently false, fictional, and refutable.

**(5)** <u>**FAILURE TO INVESTIGATE**</u>

HUDDLESTON made **no effort** to determine if RAKUN's children had actually been menaced or harmed. A cursory assessment would have revealed Barret's 1 stitch injury was not from a violent stabbing. A cursory interview would have revealed no person actually saw RAKUN shoot a gun. A brief spate of fact-finding might have revealed what RAKUN actually looked like. OGLE never sought any information from RAKUN before or after shooting him. HUDDLESTON made no effort to examine the specter of law enforcement malfeasance. The TBI was conducting a parallel inquiry focusing on OGLE's misdeeds. HUDDLESTON could not fathom the Deputies' malfeasance was a causation of the criminal charges in CR28846. A brief analysis would have indicated the facts, evidence, and legal theories in CR28846 don't align. OGLE's video refutes the charges claiming assault on a Peace Officer lodged against RAKUN.

43

**F.**                                    **IAN ALLEN**

**(1)**          **DUE PROCESS VIOLATION:FABRICATING EVIDENCE**

(1) ALLEN drafted a TBI Investigation into OGLE's shooting of RAKUN on July 13, 2021.

ALLEN manufactured evidence and false theories when his report claimed RAKUN menaced

OGLE with his rifle, and RAKUN actually discharged the weapon at law enforcement. (2) This

is patently false and refutable by OGLE's own body camera footage. RAKUN's deer rifle never

discharged. (3) ALLEN accentuated this gun discharge theory by using and documenting the

bullets CULOTTA has sprinkled on RAKUN's front porch. (4) ALLEN diligently drafted a

diagram of "where he found all the rounds." ALLEN forgets to mentioned that CULOTTA

intentionally dropped the bullets on RAKUN's front porch. The bullets were not ejected by

RAKUN. (5) ALLEN's TBI Report states he found 5 spent pistol casings (hinting at OGLE), 1

spent rifle casing (hinting at RAKUN).

**(2)**                    **FAILURE TO INVESTIGATE**

ALLEN made **no effort** to determine if RAKUN's children had actually been menaced or

harmed. A cursory assessment would have revealed Barret's 1 stitch injury was not from a

violent stabbing. A cursory interview would have revealed no person actually saw RAKUN shoot

a gun. A brief spate of fact-finding might have revealed what RAKUN actually looked like.

ALLEN gave a half-hearted effort to examine the specter of law enforcement malfeasance. The

TBI was conducting a parallel inquiry focusing on OGLE's misdeeds. ALLEN could not fathom

the Deputies' malfeasance was a causation of the criminal charges in CR28846. ALLEN

accepted OGLE's, CULOTTA's, and CATES' refusals to give statements in his TBI inquiry.

ALLEN couldn't deduce the 3 were afraid their malfeasance would be known. It's not normal for

first responder law enforcement **to refuse** to create reports. In fact, the OGLE video provides

proof the assaultive charges against law enforcement were false

**G.** **KRIS SANDERS**

**(1)** **UNLAWFUL AND "GENERAL SEARCH" WARRANT OF RAKUN'S HOME**

SANDERS relied upon inaccurate information, and made up his own facts to procure a Search Warrant of RAKUN's home on July 14, 2021. He had to because none of the 3 first responders participated in the "investigation" of the case. SANDERS' Search Warrant exceeded its scope by searching RAKUN's locked truck (not mentioned), took items not mentioned in the Affidavit (cadaver of dog), a portable safe with valuables, guns which weren't itemized, sporting equipment, household goods, and ALL of RAKUN's firearms. Many of RAKUN's firearms were sporting, and were still in storage. These had no relation to criminality. Also, a pistol within RAKUN's locked truck was seized. By any definition, SANDERS' Search Warrant was a General Search Warrant seeking **any item** potentially related to crime.

**(2)** ***Franks v. Delaware*, 438 U.S. 154 (1978) SEARCH WARRANT AFFIDAVIT**

SANDERS relied upon inaccurate information, and made up his own facts to procure a Search Warrant of RAKUN's home on July 14, 2021. He had to because none of the 3 first responders participated in the "investigation" of the case. SANDERS' Search Warrant exceeded its scope by searching RAKUN's locked truck (not mentioned), took items not mentioned in the Affidavit (cadaver of dog), a portable safe with valuables, guns which weren't itemized, sporting equipment, household goods, and ALL of RAKUN's firearms. Many of RAKUN's firearms were sporting, and were still in storage. These had no relation to criminality. Also, a pistol within RAKUN's locked truck was seized. By any definition, SANDERS' Search Warrant was a General Search Warrant seeking **any item** potentially related to crime. SANDERS provided misstatements, falsehoods, and material omissions in his Search Warrant Affidavit.

45

**H.**                                  **JAMES DUNN**

**(1)**        **DUE PROCESS VIOLATION: FABRICATION OF EVIDENCE**

DUNN promotes the theory RAKUN tried to kill OGLE on July 13, 2021. That is refuted by

OGLE's body camera footage. DUNN promotes the theory RAKUN stabbed and shot at his

children. That is refuted by Pillar's cage camera, and body camera footage. Barret has a minor

booboo which took 1 stitch to close. Barret admits he bumped into something on his wall during

the tussle with RAKUN. Alexis Rakun never stated her father shot at her. Rather, she thought she

heard gunshots and she didn't know what they were aimed at. DUNN took a special interest in

these matters, commission the TBI to look into the affair.

**(2)**        **DUE PROCESS VIOLATION: *Brady v. Maryland,* 373 U.S. 83 (1963)**

DUNN has willfully obstructed the direct requests from a Pro Se RAKUN, and from

Counsel, to produce *Brady v. Maryland* materials as required under the 6th and 14th Amendments,

It took 3 ½ years for DUNN to produce OGLE's body camera footage—which is exculpating.

DUNN's aim is to thwart justice by framing an innocent RAKUN, and denying RAKUN the

opportunity to properly defend himself. Much of the known law enforcement materials are

exculpatory. DUNN promotes the theory RAKUN tried to kill OGLE on July 13, 2021. That is

refuted by OGLE's body camera footage. DUNN promotes the theory RAKUN stabbed and shot

at his children. That is refuted by Pillar's cage camera, and body camera footage. Barret has a

minor booboo which took 1 stitch to close. Barret admits he bumped into something on his wall

during the tussle with RAKUN. Alexis Rakun never stated her father shot at her. Rather, she

thought she heard gunshots and she didn't know what they were aimed at. DUNN took a special

interest in these matters, commission the TBI to look into the affair. RAKUN filed a

comprehensive *Brady* Motion for Discovery which requested approximately 170 items which

necessarily must exist in CR28846. Only about 10% have been belatedly produced. RAKUN's

Pro Se *Brady* Motion from September 15, 2023 **is still pending.** DUNN, through MURPHY, has

repeatedly stated "certain items don't exist," which are eventually produced.

**(3)** **MALICIOUS PROSECUTION**

DUNN initiated and commenced formal criminal charges against RAKUN on August 30, 2021 which range from Attempted Murder of a Peace Officer to Leaving the Scene of an Accident. All of these charges have one thing in common: a lack of probable cause. All of these are readily refutable by the State's own evidence. **Most of these charges are not even theoretically possible, much less factually possible.** DUNN's sole purpose in prosecuting RAKUN is to protect corrupt law enforcement and to veil their malfeasance on July 13, 2021 and thereafter. In other words, to draw attention from OGLE's attempted murder of RAKUN.

**I.** **CHARLES MURPHY**

**(1)** **DUE PROCESS VIOLATION:** *Brady v. Maryland*, 373 U.S. 83 (1963)

MURPHY has willfully obstructed the direct requests from a Pro Se RAKUN, and from Counsel, to produce *Brady v. Maryland* materials as required under the 6th and 14th Amendments, It took 3 ½ years for MURPHY to produce OGLE's body camera footage—which is exculpating. MURPHY'S aim is to thwart justice by framing an innocent RAKUN, and denying RAKUN the opportunity to properly defend himself. Much of the known law enforcement materials are exculpatory. MURPHY promotes the theory RAKUN tried to kill OGLE on July 13, 2021. That is refuted by OGLE's body camera footage. MURPHY promotes the theory RAKUN stabbed and shot at his children. That is refuted by Pillar's cage camera, and body camera footage. Barret has a minor booboo which took 1 stitch to close. Barret admits he bumped into something on his wall during the tussle with RAKUN. Alexis Rakun never stated her father shot at her. Rather, she thought she heard gunshots and she didn't know what they were aimed at. RAKUN filed a comprehensive *Brady* Motion for Discovery which requested approximately 170 items which necessarily must exist in CR28846. Only about 10% have been belatedly produced. RAKUN's

47

Pro Se *Brady* Motion from September 15, 2023 **is still pending.** MURPHY has repeatedly stated "certain items don't exist," which are eventually produced.

**(2)** **MALICIOUS PROSECUTION**

MURPHY has prosecuted formal criminal charges against RAKUN commenced on August 30, 2021, which range from Attempted Murder of a Peace Officer to Leaving the Scene of an Accident. All of these charges have one thing in common: a lack of probable cause. All of these are readily refutable by the State's own evidence. **Most of these charges are not even theoretically possible, much less factually possible.** MURPHY's sole purpose in prosecuting RAKUN is to protect corrupt law enforcement and to veil their malfeasance on July 13, 2021 and thereafter. In other words, to draw attention from OGLE's attempted murder of RAKUN.

**J.** **SEVIER COUNTY, TENNESSEE**

*Monell v. New York City Dept. of Social Services,* **436 U.S. 658 (1978)**

All of the factual allegations in Section VI (paragraphs 45-59) are adopted and incorporated in their entirety.

**(1)** **FAILURES TO TRAIN ON 4th AMENDMENT FOUNDATIONS.**

These were covered in Section VI (paragraphs 45-59). SEVIER fails to Train on Reasonable Suspicion, Probable Cause, Warrantless Arrests, Warrantless Searches, evidentiary chains of custody, etc. Each one of these deficiencies can represent a separate claim. This lack of training was evident from the arrival of OGLE, to his shooting of RAKUN, to the planting of evidence from CULOTTA, to the unlawful seizure of RAKUN's heirlooms by HUDDLESTON.

**(2)** **CONSTITUTIONALLY DEFECTIVE MEDICAL CARE AT SEVIER JAIL**

RAKUN's medical condition rapidly deteriorated in his 2 week stay in the Sevier County Jail. RAKUN was denied his medication, and was not granted refills of his prescriptions. RAKUN was in an acute state, as he still had bullet fragments inside him. RAKUN also had

blood clots which were quite perilous. RAKUN's family found him in a coma-like stupor, and near death when they were finally able to see him. The staff at the Jail were deliberately indifferent to RAKUN's critical care needs; and did nothing.

**(3)**            **SEVIER POLICY OF EXCESSIVE FORCE**

SEVIER Deputies are allowed to abuse the public, and have no constitutional limits on the degree of force they choose. Deadly force is a first option, not a last resort in SEVIER. Deputies are permitted to use gratuitous physical force against the public as well.

**(4)**            **SEVIER POLICY OF UNLAWFUL ARRESTS/DETENTIONS**

SEVIER Deputies are permitted to seize individuals in the absence of a reasonable suspicion. Deputies are then able to parlay unlawful detentions into de facto arrests without probable cause. RAKUN experienced a world record 35 day *Terry* detention under guard.

**(5)**            **SEVIER COUNTY FAILURE TO SUPERVISE**

SEVIER Deputies don't have to respond to higher authority. OGLE, CATES, and CULOTTA refused to cooperate with the TBI investigation into the shooting of RAKUN. SEVIER Deputies don't have to draft reports of their activities, uses of force, or criminal investigations. SEVIER Deputies don't have to account for their conduct, or to document it. This results in violent assaults against the public, and malfeasance resulting in planting evidence.

**(6)**            **SEVIER COUNTY FAILURE TO DISCIPLINE**

SEVIER Deputies are not disciplined, fined, sanctioned, or censured. OGLE nearly killed RAKUN, and didn't even have to draft a mundane Sheriff's Report of his activities. Deputies are permitted to perpetrate unlawful searches, unlawful seizures, and excessive force against the public. Deputies are not punished for failing to perform ministerial duties. Duties required under Tennessee law.

49

**(7)**     <u>**SEVIER COUNTY FAILURE TO SCREEN IN HIRING**</u>

SEVIER County hires Deputies who are not morally, professionally, or psychologically suited or qualified for law enforcement. For example, OGLE was a late bloomer, wanting to join law enforcement after age 40. OGLE has G.E.D education and was a used car salesman. OGLE also has convictions of Misdemeanor Offenses which constitute moral turpitude. This lack of screening upon hiring results in Deputies of low moral character and aggressive tendencies. One can see from RAKUN's incident, this failure to weed out unqualified candidates resulted in a shooting, unlawful detention, unlawful searches, the planting of evidence, the theft of personal property, and the filing of bogus criminal charges in CR28846.

**VIII.**                          <u>**DAMAGES AND RELIEF**</u>

All stated dollar amounts are in United States Currency amounts.

**(1)**               <u>**DEFENDANT SEVIER COUNTY, TEXAS**</u>

RAKUN seeks Compensatory damages in the amount of $10,000,000.00 against SEVIER.

**(2)**                     <u>**DEFENDANT CHAD OGLE**</u>

RAKUN seeks Compensatory damages in the amount of $20,000,000.00 against OGLE. RAKUN seeks Punitive Damages in appropriate amounts to dissuade such future conduct.

**(3)**                     <u>**DEFENDANT HUNTER CATES**</u>

RAKUN seeks Compensatory damages in the amount of $1,000,000.00 against CATES. RAKUN seeks Punitive Damages in appropriate amounts to dissuade such future conduct.

**(4)**                     <u>**DEFENDANT TIMOTHY CULOTTA**</u>

RAKUN seeks Compensatory damages in the amount of $2,000,000.00 against CULOTTA. RAKUN seeks Punitive Damages in appropriate amounts to dissuade such future conduct.

**(5)**                     <u>**DEFENDANT DEXTER ROBBINS**</u>

RAKUN seeks Compensatory damages in the amount of $2,000,000.00 against ROBBINS. RAKUN seeks Punitive Damages in appropriate amounts to dissuade such future conduct.

**(6)**            <u>**DEFENDANT JIMMY HUDDLESTON**</u>

RAKUN seeks Compensatory damages in the amount of $5,000,000.00 against HUDDLESTON. RAKUN seeks Punitive Damages in appropriate amounts to dissuade such future conduct.

**(7)**            <u>**DEFENDANT IAN ALLEN**</u>

RAKUN seeks Compensatory damages in the amount of $5,000,000.00 against ALLEN. RAKUN seeks Punitive Damages in appropriate amounts to dissuade such future conduct.

**(8)**            <u>**DEFENDANT KRIS SANDERS**</u>

RAKUN seeks Compensatory damages in the amount of $3,000,000.00 against SANDERS. RAKUN seeks Punitive Damages in appropriate amounts to dissuade such future conduct.

**(9)**            <u>**DEFENDANT JAMES DUNN**</u>

RAKUN seeks Compensatory damages in the amount of $10,000,000.00 against DUNN. RAKUN seeks Punitive Damages in appropriate amounts to dissuade such future conduct.

**(10)**           <u>**DEFENDANT CHARLES MURPHY**</u>

RAKUN seeks Compensatory damages in the amount of $4,000,000.00 against MURPHY. RAKUN seeks Punitive Damages in appropriate amounts to dissuade such future conduct.

**IX.**            <u>**JURY TRIAL DEMAND**</u>

Pursuant to the Federal Rule of Civil Procedure 38(b), Plaintiff Lee Rakun demands a jury trial on all claims and legal theories triable.

**X.**            <u>**PRAYER FOR RELIEF**</u>

Plaintiff Lee Rakun respectfully prays for the following relief upon final resolution:

(a) AWARD Lee Rakun Compensatory Damages in the amounts pled;

(b) AWARD Punitive Damages in appropriate amounts to dissuade such future conduct;

(c) AWARD Plaintiff his costs of suit;

(d) GRANT Plaintiff any other relief in equity and at law he shows himself entitled to.

Respectfully Submitted,

*Lee Rakun*
Pro Se
3304 Robeson Road
Sevierville, Tennessee 37862
(210) 240-5499
valhalla4080@gmail.com

52